UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:22-CV-00096-GNS-HBB

JASON GREEN                                                    PLAINTIFF

v.

KENNY PERKINS et al.                                          DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' Motions for Leave to File Excess Pages (DN 35, 47); Defendants' Motion for Summary Judgment (DN 34); Defendants' Motion to Exclude Evidence (DN 36); and Plaintiff's Motion to Strike (DN 50). The motions are ripe for adjudication.

**I.    BACKGROUND**

This case concerns an interaction between Plaintiff Jason Green ("Green") and the Adair County Sherriff's Department ("ACSD") on the evening of August 9, 2021. (Green Dep. 26:5-10, 61:12-15, Mar. 5, 2024, DN 34-1). Earlier that day, Treva Smith ("Treva"), the grandmother of Green's daughter, drove Green to his parents' home in Columbia, Kentucky. (V. Smith Dep. 13:13-20, Aug. 29, 2024, DN 34-14). Upon arrival, Green, who was high on methamphetamine and marijuana, asked his parents, Charles Smith ("Charles") and Vickie Smith ("Vickie"), for gas money to pay Treva. (Green Dep. 26:13-25; V. Smith Dep. 14:2-5). Charles and Vickie informed Green that they did not have any money, so Green grabbed a container of gasoline to offer Treva. who had left before Green could offer her the gasoline. (V. Smith Dep. 14:2-15). In his intoxicated state, Green began splashing gasoline onto himself while wandering around the property. (Green Dep. 29:11-22). Vickie called 911 and informed the ACSD that Green was on

drugs; holding a jug of gasoline; and presumably had a lighter on his person, as he was a habitual smoker. (Defs.' Mot. Summ. J. Ex. D, at 1:00-2:45, DN 39; V. Smith Dep. 30:6-22). Upon learning that the police were on their way, Green began to leave. (Green Dep. 38:19-39:9).

Defendants ACSD Deputies Kenny Perkins ("Perkins") and Joey Keith ("Keith") responded to the dispatch call and intercepted Green as he was leaving the property. (Perkins Dep. 10:8-20, May 15, 2024, DN 34-5; Green Dep. 38:19-39:3). Green attempted to climb a fence, and Vickie tried to keep him from leaving. (V. Smith Dep. 20:4-15). After she let go of Green, he jumped down from the fence, poured gasoline on himself, dropped the gasoline jug, and turned to face the deputies. (Green Dep. 44:7-45:12). At this time, Perkins and Keith had their tasers aimed at Green. (Green Dep. 44:7-45:12). Vickie moved in front of Green, yelling to the deputies "don't shoot." (V. Smith Dep. 27:3-13). The parties disagree whether Green was holding a lighter at this moment. (Green Dep. 47:13-16; Perkins Dep. 12:23-13:4; Keith Dep. 13:23-14:16, Aug. 21, 2024, DN 34-6).[1] Vickie then backed away from Green, and Perkins and Keith both fired their tasers. (V. Smith Dep. 28:3-7). Green erupted in flames, and Charles extinguished the fire using a nearby bucket of water. (Green Dep. 47:22-49:2).

Green was taken to the burn unit at the University of Louisville hospital. (Green Dep. 61:12-15). Keith collected evidence from the scene, including Green and Vickie's clothes. (Keith Dep. 14:18-15:9). Ashley Harvey ("Harvey"), the EMT who tended to Green, testified that she asked him in the ambulance if he was trying to kill his mother, to which he replied, "I believe I

---

[1] Both Keith and Perkins testified that Green had a lighter; however, their accounts differ regarding whether a spark was present. (Perkins Dep. 12:23-13:9; Keith Dep. 13:23-14:16). Perkins testified that Green "was flicking [the lighter], and it didn't spark[,]" while Keith has stated that Green was flicking a lighter and that he did see the lighter spark. (Perkins Dep. 12:23-13:9; Keith Dep. 13:23-14:16). Green maintains that there was no lighter present, evidenced by the fact that no lighter was ever recovered from the scene. (Green Dep. 47:13-16; Perkins Dep. 14:1-3; Keith Dep. 14:17-20).

was." (Harvey Dep. 9:17-19, Nov. 12, 2024, DN 34-7). Harvey also testified that Green told her he "was flicking [his] lighter" when he ignited. (Harvey Dep. 9:20-21). Green was charged and indicted by a grand jury for wanton endangerment in the first degree, public intoxication, and being a persistent felony offender. (Defs.' Mot. Summ. J. Ex. K, at 1-3, DN 34-11). Perkins and Keith both testified at various hearings that Green had a lighter at the time of the incident and was about to kill his mother before they deployed their tasers. (Defs.' Mot. Summ. J. Ex. K, at 1-3; Defs.' Mot. Summ. J. Ex. I, at 2, DN 34-9; Perkins Dep. 13:5-9; Keith Dep. 9:21-23, 16:21-17:7). . At trial, Green was granted a directed verdict on the public intoxication charge, and a jury acquitted him of the charge for wanton endangerment. (Defs.' Mot. Summ. J. Ex. I, at 2-3).

Green brought this suit against Perkins, Keith, and ACSD Sheriff Joshua Brockman ("Brockman") (collectively, "Defendants") in their individual and official capacities. (Am. Compl. ¶¶ 7-8, 62-64, DN 32). Brockman was not present during the tasing incident but was responsible for ensuring the proper training for Perkins and Keith. (Brockman Dep. 8:1-13, 17:24-18:10, Sept. 16, 2024, DN 34-16). Green asserts the following causes of action: (1) violation of his Fourth Amendment rights—unreasonable search and seizure, false arrest, malicious prosecution, and excessive force—under 42 U.S.C. § 1983 (hereinafter "Section 1983") against all Defendants; (2) unconstitutional policy or custom against Brockman; (3) assault and battery against Perkins and Keith; (4) false imprisonment against Perkins and Keith; (5) official misconduct under KRS 522.020 against all Defendants; (6) negligence, gross negligence, and negligence per se against Perkins and Keith; (7) intentional infliction of emotional distress (hereinafter, "IIED") against all Defendants; and (8) malicious prosecution against Perkins and Keith. (Am. Compl. ¶¶ 30-79). Defendants have moved for summary judgment (DN 34) on all counts and for leave to file excess pages for their memorandum and reply in support of summary

judgment (DN 35, 47). Defendants also seek to exclude various types of evidence (DN 36).  Green has moved to strike Defendants' motion to exclude and the reply in support thereof (DN 50).

## II.    <u>JURISDICTION</u>

The Court has subject-matter jurisdiction because a federal question is presented.  *See* 28 U.S.C. § 1331.  In addition, the Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367(a).

## III.    <u>DISCUSSION</u>

### A.    <u>Defendants' Motions for Leave to File Excess Pages</u>

Defendants move for leave to file excess pages regarding their memorandum (DN 34-12) and reply (DN 48) in support for summary judgment.  (Defs.' Mot. Leave, DN 35 [hereinafter Defs.' 1st Mot. Leave]; Defs.' Mot. Leave, DN 47 [hereinafter Defs.' 2d Mot. Leave]).[2]  In both instances, Defendants filed their motion contemporaneously with their memorandum/reply. (Defs.' 1st Mot. Leave; Defs.' 2d Mot. Leave).  The motions are substantively similar, with Defendants seeking exceeded page limits due to the complicated issues of constitutional, statutory, and common law involved and the fact that the three Defendants chose to file a single memorandum/reply "for efficiency and to avoid repetition of arguments.  (Defs.' 1st Mot. Leave 2; Defs.' 2d Mot. Leave 2).  Green argues that Defendants have "demonstrated a persistent pattern of willful noncompliance" by filing their documents without first seeking leave from the Court

---

[2] Local Rule 7.1(d) provides that motions may not exceed 25 pages in length and replies may not exceed 15 pages in length.  LR 7.1(d).  Defendants' memorandum is 38 pages in length and their reply is 21 pages in length.  (Defs.' Mem. Supp. Mot. Summ. J., DN 34-12; Defs.' Reply Mot. Summ. J., DN 48).

and do not require additional pages "based upon the substance of their arguments." (Pl.'s Resp. Defs.' Mots. Leave 1-2, DN 49).

Green relies on this this Court's holding in *Packard v. Mariner Financial*, No. 3:19-CV-00553-GNS, 2020 U.S. Dist. LEXIS 37373 (W.D. Ky. Mar. 4, 2020), which found that "a motion for leave to exceed the page limit should include the proposed response or reply as an attached exhibit, *not* as a separately filed document." *Id.* at *2. In that case, the plaintiffs' motion to exceed the page limit established in LR 7.1 was denied for two reasons: first, the plaintiffs failed to file their motion with the proposed response as an exhibit. *Id.* Second, and more importantly, "[a] review of [p]laintiffs' response, spanning 57 pages plus an additional 123 pages of exhibits, reflect[ed] an apparent attempt to transform a response to a motion to dismiss into a response to a motion for summary judgment." *Id.* In the current case, Defendants have only committed the procedural error exemplified by the first reason in *Packard*. Although Defendants should have filed the proposed reply as an attached exhibit to their motion for leave, this mistake does not appear to prejudice Green nor unduly delay proceedings. Furthermore, Defendants' request is reasonable because it promotes efficiency by combining the three Defendants' filings into single motions. As such, Defendants' motions for leave to file excess pages are granted.

## B.    Defendants' Motion for Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party moving for summary judgment may satisfy its burden [of] show[ing] that there are no genuine issues of material fact simply 'by pointing out to the court that the [non-moving party], having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.'" *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (quoting

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).  Similarly, the movant may meet its burden by offering evidence negating an essential element of the non-moving party's claim.  *See Dixon v. United States*, 178 F.3d 1294, 1999 WL 196498, at *3 (6th Cir. 1999).

After the movant either shows "that there is an absence of evidence to support the nonmoving party's case[,]" or affirmatively negates an essential element of the non-moving party's claims, the non-moving party must identify admissible evidence that creates a dispute of fact for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  While the Court must view the evidence in a light most favorable to the non-moving party, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  "The mere existence of a scintilla of evidence in support of the [moving party's] position [is] [] insufficient; there must be evidence on which the jury could reasonably find for the [moving party]."  *Anderson*, 477 U.S. at 252.  Green's individual claims are addressed below.

### 1.    *Section 1983 Claims—Individual Capacity*

Section 1983 does not provide substantive rights to a plaintiff but creates a mechanism for a remedy when there is a deprivation of a constitutional right or an otherwise established right.  *See Flint ex rel. Flint v. Ky. Dep't of Corr.*, 270 F.3d 340, 351 (6th Cir. 2001).  Here, Green brings claims against Defendants for alleged violations of his Fourth Amendment rights in four forms: (1) false arrest; (2) malicious prosecution; (3) unreasonable search and seizure; and (4) excessive force.  (Am. Compl. ¶¶ 30-36, 48-51).[3]  Although it is unclear whether Green brings these claims

---

[3]  In addition to the Fourth Amendment, the Amended Complaint references "[Green's] constitutional right to equal protection."  (Am. Compl. ¶ 32).  Defendants correctly state that Green "has not alleged that he was treated differently than other persons similarly situated in violation of

against the Defendants in their individual capacities, the Court will address the potential liability for all Defendants.

### a.    Brockman Has No Individual Liability

As mentioned previously, Brockman was not present during the tasing incident. (*See* Brockman Dep. 17:24-18:10). Indeed, Brockman's first involvement in the case occurred later that night when he arrived at the hospital to "check[] on [] Green's status." (Brockman Dep. 18:1-7). Defendants argue that because "Brockman was not even present at the time of the incident giving rise to this action[,] . . . [he] is therefore entitled to dismissal of all claims brought against him in his individual capacity." (Defs.' Mem. Supp. Mot. Summ. J. 16 n.5, DN 34-12). Plaintiff does not respond to this argument, but alleges liability against Brockman for the failure to train (i.e., *Monell*) claim. (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 17-19, DN 43). Green has abandoned his right to any Section 1983 claim against Brockman in his individual capacity by failing to respond to Defendants' argument. *See Bennett*, 86 F.4th at 324 (citations omitted). These claims, therefore, are dismissed, and the remaining Section 1983 individual capacity claims will be analyzed for only Perkins and Keith.

### b.    False Arrest

Green brings Section 1983 claims for false arrest under the Fourth Amendment. (Am. Compl. ¶¶ 33, 48-51). "In order for a wrongful arrest claim to succeed under [Section] 1983, a plaintiff must prove that the police lacked probable cause." *Fridley v. Horrighs*, 291 F.3d 867,

---

the Equal Protection Clause[,]" and they seek dismissal of any potential Section 1983 claim brought under a violation of the equal protection clause of the Fourteenth Amendment. (Defs.' Mem. Supp. Mot. Summ. J. 17). Green has failed to respond to this argument, and, therefore, any potential claim under the Equal Protection Clause is dismissed. *See Bennett v. Hurley Med. Ctr.*, 86 F.4th 314, 324 (6th Cir. 2023) ("When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited." (citations omitted)).

872 (6th Cir. 2002) (citation omitted).  Probable cause exists when "the facts and circumstances within [an officer's] knowledge" would "inform 'a prudent person, or one of reasonable caution,' that the suspect 'has committed, is committing, or is about to commit an offense.'"  *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).  In a Section 1983 action, the existence of probable cause is typically a question for a jury to decide, "unless there is only one reasonable determination possible."  *Pyles v. Raisor*, 60 F.3d 1211, 1215 (6th Cir. 1995) (citation omitted).  Additionally, probable cause may be established through a grand jury indictment.  *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002) ("[I]t has long been settled that 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause . . . .'" (quoting *Ex parte United States*, 287 U.S. 241, 250 (1932))).  A plaintiff may rebut this presumption by demonstrating that "defendants knowingly or recklessly present[ed] false testimony to the grand jury to obtain the indictment."  *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (citations omitted).  Moreover, the Sixth Circuit has previously held that "evidence of an officer's actions prior to and independent of his grand-jury testimony may call into question the presumption of probable cause created by an indictment . . . ."  *King v. Harwood*, 852 F.3d 568, 590 (6th Cir. 2017).

In the current case, Green posits that "Perkins' grand jury testimony contained knowingly false and inaccurate statements which caused the indictment."  (Pl.'s Resp. Defs.' Mot. Summ. J. 14).  He claims that Perkins' testimony contradicted both the evidence in the record and Keith's testimony.  (Pl.'s Resp. Defs.' Mot. Summ. J. 14).  To this end, Green argues that Perkins' testimony misquoted Vickie's 911 call and exaggerated the harm that Green posed to Vickie by indicating to the grand jury that Green was holding a lighter and attempting to ignite both himself and Vickie at the time of his arrest.  (Pl.'s Resp. Defs.' Mot. Summ. J. 14-15).

The notion that Green could start a fire is premised on the disputed fact that he had a lighter in his possession, which he adamantly denies. (Green Dep. 47:13-16; Perkins Dep. 12:23-13:9; Keith Dep. 13:23-14:16). As stated previously, no lighter was recovered from the scene. (Perkins Dep. 14:1-3; Keith Dep. 14:17-20). Green's mother stated in her 911 call that she assumed Green had a lighter on his person due to the fact that he was a habitual smoker; however, she has also testified there was no lighter present when the officers fired their tasers. (V. Smith Dep. 31:7-21).

On summary judgment, the Court is required to view evidence in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Viewing the evidence in the light most favorable to Green, the existence of a lighter is certainly material because its presence in Green's possession would have posed an immediate threat to others, in particular, Green's mother. *See Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) ( "[A]n issue is 'material' if the facts alleged are such as to constitute a legal defense or are of such nature as to affect the result of the action." (citations omitted)). In ruling on a motion for summary judgment, "[t]he judge is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 249). Thus, for the purposes of this motion, the Court must assume that Green was not holding a lighter was he was tased.

If there was no lighter, then it is not clear that Perkins and Green had probable cause to arrest Green for wanton endangerment. Under Kentucky law, wanton endangerment occurs when, "under circumstances manifesting extreme indifference to the value of human life, [a person] wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." KRS 508.660(1). In the current case, the existence of a lighter is material to determining whether Green posed a substantial danger to himself, his mother, and the officers.

That finding is also determinative to whether Perkins presented false or misleading testimony during the grand jury proceedings. For these reasons, it cannot be determined at this time whether Perkins and Green had probable cause to arrest Green, and Defendants' motion for summary judgment regarding Green's Section 1983 claim for false arrest must be denied.

### c.     Malicious Prosecution[4]

To succeed on a Section 1983 claim for malicious prosecution, Green must prove that

[1] a criminal prosecution was initiated against the [him] and that the defendant ma[d]e, influence[d], or participate[d] in the decision to prosecute[;] . . . .
[2] that there was a lack of probable cause for the criminal prosecution[;] . . . .
[3] that, as a consequence of a legal proceeding, [Green] suffered a deprivation of liberty, as understood in our Fourth Amendment jurisprudence, apart from the initial seizure[;] [and]
[4] the criminal proceeding must have been resolved in the plaintiff's favor.

*Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010) (internal quotation marks omitted) (internal citations omitted) (citation omitted). As discussed above, it cannot be determined at this time whether Perkins and Green had probable cause to arrest Green, given the material facts in dispute. For this reason, the Section 1983 claim for malicious prosecution against Perkins and Keith in their individual capacities must survive summary judgment. Defendants' motion for summary judgment is denied for this claim.

---

[4] The claim for malicious prosecution can be implied from the following language in the amended complaint: "The aforementioned actions of officers [] Perkins and [] Keith . . . subjected [Green] to false and malicious charges that violated [his] civil and constitutional rights . . . ." (Am. Compl. ¶¶ 33, 48-51). Although it is unclear whether this language alone constitutes a separate claim, Defendants' motion and Green's response both address a Section 1983 claim for malicious prosecution. (Defs.' Mem. Supp. Mot. Summ. J. 23-24; Pl.'s Resp. Defs.' Mot. Summ. J. 13-15). Therefore, the Court will infer that Green has brought a federal malicious prosecution claim, in addition to his malicious prosecution claim under state law.

### d.    Unreasonable Search and Seizure

Defendants argue that "the Sixth Circuit has repeatedly held that a Plaintiff cannot allege a violation of state law in an action under [Section 1983]" and thus Green's "claim for 'unreasonable search and seizure' and 'false arrest' under Section 1983 are one and the same." (Defs.' Mem. Supp. Mot. Summ. J. 18 (citing *Zucker v. City of Farmington Hills*, 643 F. App'x 555, 565 (6th Cir. 2016))).  Green fails to rebut Defendants' position in his response and provides no analysis for a broad "unreasonable search and seizure" claim separate from his other Section 1983 claims under the Fourth Amendment.  (*See* Pl.'s Resp. Defs.' Mot. Summ. J. 8).  For this reason, the Court will consider any additional claim for "unreasonable search and seizure" brought under the Fourth Amendment as abandoned.  *See Bennett*, 86 F.4th at 324 (citations omitted). Defendants' motion is granted as to this claim and it is dismissed.

### e.    Excessive Force

Next, Green brings Section 1983 claims for excessive force under the Fourth Amendment against Perkins and Keith in their individual capacities.  Defendants seek dismissal of these claims by arguing the officers are entitled to qualified immunity for their actions.  (Defs.' Mem. Supp. Mot. Summ. J. 20-23).

### i.    Qualified Immunity

The Supreme Court has held that qualified immunity generally shields "government officials performing discretionary functions . . . for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 817 (1982) (citations omitted).  As the Sixth Circuit has instructed, summary judgment is the correct stage of the litigation to determine a

qualified immunity defense.  *See Wesley v. Campbell*, 779 F.3d 421, 433-34 (6th Cir. 2015).  The

Sixth Circuit has explained when qualified immunity applies to an officer's actions:

> Qualified immunity will ordinarily apply unless it is obvious that a reasonably competent official would have concluded that the actions taken were unlawful.  The qualified immunity analysis is a two-step inquiry:  (1) whether a constitutional right has been violated; and (2) whether that right was clearly established, though the steps need not be taken in that order.  The clearly established step asks whether existing precedent placed the conclusion that the defendant violated the constitution under the circumstances beyond debate.

*Getz v. Swoap*, 833 F.3d 646, 652 (6th Cir. 2016) (internal quotation marks omitted) (internal

citations omitted) (citation omitted).

A plaintiff has the burden of showing a defendant is not entitled to qualified immunity

when a defendant raises the initial qualified immunity defense.  *Johnson v. Moseley*, 790 F.3d 649,

653 (6th Cir. 2015) (citation omitted).  A defendant must first provide facts showing that the

actions taken were within his or her discretionary authority.  *See Hartman v. Thompson*, No. 3:16-

CV-00114-GNS-DW, 2018 WL 793440, at *4 (W.D. Ky. Feb. 7, 2018) (citing *Gardenhire v.

Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)).  Here, Defendants correctly state that "[i]t is well

established that a police officer's decision of how much force is required in a particular situation

is a discretionary act."  (Defs.' Mem. Supp. Mot. Summ. J. 27 (citing *Casey v. Sanders*, No. 7:17-

CV-145-KKC, 2018 WL 3078758, at *8 (E.D. Ky. June 21, 2018))).  This principle also comports

with Sixth Circuit precedent.  *See Reich v. City of Elizabethtown*, 945 F.3d 968, 982 (6th Cir.

2019).  Because it has been established that Perkins and Keith were performing discretionary acts

in deciding how much force was required when they tased Green, the Court will now discuss the

two prongs of the qualified immunity analysis.

a)     **Violation of a Constitutional Right**

Qualified immunity analysis begins by determining what constitutional rights may be implicated in the given case and the extent of the potential violation. *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998) (citations omitted). Green's Section 1983 claim against Perkins and Keith for excessive force is based on the Fourth Amendment right against unlawful searches and seizures. (*See* Pl.'s Mot. Partial Summ. J. 1). Specifically, the Court must determine whether Green had a constitutional right to not be tased under the circumstances which led to him being set on fire. The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. These Fourth Amendment protections include a safeguard against an officer using excessive force during an arrest or a stop. *Graham v. Connor*, 490 U.S. 386, 394 (1989). A court utilizes the "objective reasonableness" standard when evaluating such an excessive force claim. *See Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (citing *Graham*, 490 U.S. at 396). This test considers "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 387 (citation omitted). Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (citation omitted).

A court undergoes this analysis by balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* (citation omitted). It requires assessing the following factors: "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). When examining these factors, a court must

identify a seizure and determine "whether the force used to effect that seizure was reasonable in the totality of the circumstances, not whether it was reasonable for the police to create the circumstances." *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (quoting *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)). In the current case, Green has admitted that he was attempting to evade the police. (Green Dep. 44:7-10 ) Furthermore, wanton endangerment in the first degree is a class D felony under Kentucky law, indicating a high level of seriousness. *See* KRS 508.060.

What remains is the second *Graham* factor: whether Green posed "an immediate threat to the safety of the officers or others . . . ." *Graham*, 490 U.S. at 396 (citation omitted). Within this factor, the parties disagree on the extent to which Green posed a threat to Perkins, Keith, and his mother, Vickie: Defendants argue that "the actions taken by Deputies Perkins and Keith were objectively reasonable given the fact that [Green] had the apparent capability of setting himself on fire and harming others in the process, with the potential to set his mother and officers on fire." (Defs.' Mem. Supp. Mot. Summ. J. 22-23). As mentioned previously, the Court must view the evidence in the light mist favorable to Green for the purposes of this motion, and that includes assuming that there was no lighter present when Perkins and Keith deployed their tasers. *Matsushita Elec. Indust. Co.*, 475 U.S. at 586. The Court must now determine whether Green had a constitutional right to not be tased while he was doused in gasoline and posed no other immediate threat to the officers or others.

Defendants cite to the Fifth Circuit's opinion in *Ramirez v. Guadarrama*, 3 F.4th 129 (5th Cir. 2021), to argue that the actions of Perkins and Keith were objectively reasonable. (Defs.' Mem. Supp. Mot. Summ. J. 21). In *Ramirez*, officers tased an individual who was soaked in gasoline, threatening to burn down his residence, and appeared to be holding a lighter. *Ramirez*,

3 F.4th at 134.  The man erupted in flames and later died.  *Id.*  The officers' actions were found to be reasonable under the circumstances, as the man "posed a substantial and immediate risk of death or serious bodily injury to himself and everyone in the house."  *Id.* at 135.  In the current case, we must assume there was no lighter present, and thus *Ramirez* is factually distinct.  Additionally, there is no evidence here that Green was threatening to burn down his parents' residence—he was outside and clearly trying to escape the property.  (Green Dep. 44:7-10).  It should have been clear to Perkins and Keith that tasing an individual soaked in gasoline could cause him to ignite, as Keith admits in his deposition.  (Keith Dep. 29:1-18 ("[Q]:  Okay. Did they ever tell you what happens if you administer a taser to gasoline or combustible, ignitable liquids?  [A]:  Yes.  [Q]:  What did they tell you?  [A]:  That it could cause a fire.")).

Under these circumstances, it cannot be said that the actions of Perkins and Keith were objectively reasonable.  A jury is required to determine whether a lighter was present at the time of the tasing, and, for the purposes of this motion, the Court must assume one was not.  Thus, Perkins and Keith allegedly used their tasers on an individual soaked in gasoline and posing no substantial threat to others around him.  This prong of the qualified immunity analysis, at this time, weighs in favor of Green.

### b)     Clearly Established Constitutional Right

To overcome the defense of qualified immunity, Green must also demonstrate that the right to not be tased under these circumstances was clearly established at the time of the encounter.  The "salient question in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional."  *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (internal quotation marks omitted) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2022)).  Indeed, "a defendant cannot be said to have violated a clearly established right unless the right's contours

were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014) (citation omitted). Qualified immunity "'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Getz*, 833 F.3d at 652 (quoting *Johnson*, 790 F.3d at 653). The unlawfulness of an officer's actions 'can be "clearly established" from direct holdings, from specific examples describing certain conduct as prohibited, or from the general reasoning that a court employs." *Baynes v. Cleland*, 799 F.3d 600, 612 (6th Cir. 2015) (citing *Hope*, 536 U.S. at 739).

The Sixth Circuit has held that "right to be free from excessive force is a clearly established Fourth Amendment right." *Neague v. Cynkar*, 258 F.3d 504, 507 (6th Cir. 2001) (citing *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993)). Moreover, an officer's "gratuitous or excessive use of a taser would violate a clearly established constitutional right." *Landis v. Baker*, 297 F. App'x 453, 463 (6th Cir. 2008) (citation omitted). Defendants again rely on the holding in *Ramirez* to argue that "no clearly established right of [Green's] was violated by usage of tasers in the factual scenario before the Court." (Defs.' Mem. Supp. Mot. Summ. J. 23). As already discussed, *Ramirez* is inapplicable here because the Court must infer that Green was not holding a lighter at the time of his tasing. There is no evidence here that Green was resisting arrest. The Sixth Circuit has held that "the right to be free from physical force when one is not resisting the police is a clearly established right." *Wysong v. City of Heath*, 260 F. App'x 848, 856 (6th Cir. 2008) (citation omitted). Assuming there was no lighter, Perkins and Keith should have known that tasing an individual who was not resisting arrest was unlawful. *See Cockrell v. City of Cincinnati*, 468 F. App'x 491, 496 (6th Cir. 2012) (collecting cases where the tasing of non-resistant individuals violated a clearly established right). It is true that "flight, non-violent though

16

it may be, is still a form of resistance." *Id.* Green, however, had already backed away from the fence and turned to face the officers before they fired their tasers. (Green Dep. 44:7-45:12). Indeed, Perkins and Keith do not state that they used their tasers because Green was fleeing: Perkins states he "chose to use the taser" to "get[] [Green] on the ground to prevent him from dying[,]" and Keith states he deployed his taser "to keep [Green] from going into his mother, and lighting her up with him, and killing her." (Perkins Dep. 49:5-8; Keith Dep. 31:24-32:1). Assuming that Green did not possess a lighter, and thus was not an immediate threat, the officers' reasonings for deploying their tasers do not justify the substantial risk their actions posed to Green's safety.

With material facts still in dispute, it cannot be determined that Perkins and Keith violated Green's clearly established right. For the purposes of this motion, Defendants are not entitled to qualified immunity, and the Section 1983 claim for excessive force against Perkins and Keith survives summary judgment.

### 2. *Section 1983 Claims—Official Capacity*

#### a. **Defendants' Official Capacities**

To the extent that the individual state employees are sued in their official capacities, this "is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (citation omitted). Thus, any Section 1983 claims against Perkins, Keith, and Brockman in their official capacities will be considered claims against ACSD. ACSD's liability, through Brockman's alleged failure to train, will be analyzed according to the standard articulated in *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (2018).

17

b.    *Monell* Liability—Failure to Train

"[A] local government may not be sued under [Section] 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694 (2018).  Instead, "a municipality can be liable under [Section] 1983 only where its policies are the 'moving force [behind] the constitutional violation.'" *City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (second alteration in original) (citation omitted).  A plaintiff bringing a *Monell* claim must show that:  (1) his or her rights were violated; and (2) the municipality was responsible for the violation.  *See Doe v. Claiborne Cnty. By & Through Claiborne Cnty. Bd. of Educ.*, 103 F.3d 495, 505-06 (6th Cir. 1996).  There are four theories by which a plaintiff can establish liability under *Monell*:  "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate  training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019) (quoting *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

In this instance, Green brings his *Monell* claim under the theory of inadequate employee training.  (Pl.'s Resp. Defs.' Mot. Summ. J. 17).[5]  To sustain a claim under this theory, Green must demonstrate that "[1] the City's training program was inadequate for the tasks that officers must perform; [2] the inadequacy was the result of the City's deliberate indifference; and [3] the

---

[5] Green has conceded his "claim for official misconduct[,] as . . . [he] has learned that there is no identifiable taser training and/or taser policy."  (Pl.'s Resp. Defs.' Mot. Summ. J. 15 n.1).  This concession is mentioned under Green's argument concerning his state law claims, so it is not entirely clear whether he intends to concede his Section 1983 claims for unlawful policy or custom under a theory of *Monell* liability.  Regardless, Plaintiff has failed to address any argument for unlawful policy or custom under *Monell* in his response, and this claim will be treated as abandoned.  *See Bennett*, 86 F.4th at 324 (citations omitted).  Thus, summary judgment is granted as to this claim, and the analysis will focus on Brockman's alleged failure to train Perkins and Keith.

inadequacy was closely related to or actually caused the injury." *Ciminillo v. Streicher*, 434 F.3d 461, 469 (6th Cir. 2006) (citation omitted). "[A] municipality can be liable for a failure to train only when that failure reflects 'a deliberate or conscious choice.'" *Id.* (quoting *City of Canton*, 489 U.S. at 389) (internal quotations marks omitted).

Green has failed to meet this burden. He argues "[ACSD] does not provide taser training at all, instead relying solely on prior training records from other agencies." (Pl.'s Resp. Defs.' Mot. Summ. J. 18 (citing Brockman Dep. 8)). He also states that despite the fact that "Perkins' personnel file contains no certification whatsoever from the Kentucky State Police or any other agency[,] . . . Brockman issued a taser to [] Perkins." (Pl.'s Resp. Defs.' Mot. Summ. J. 18 (internal citation omitted)). Both Perkins and Keith have testified they received taser training prior to joining ACSD. (Perkins Dep. 50:9-18; Keith Dep. 47:3-5). Other than claiming that Perkins' personnel file does not contain his taser certification, Green has pointed to no evidence to refute Defendants' assertion that they did receive training. Even assuming, *arguendo*, that Brockman issued a taser to Perkins without first verifying his certification, Green has not established this "failure reflects 'a deliberate or conscious choice.'" *Ciminillo*, 434 F.3d at 469 (citation omitted). Brockman has testified that "all of [his] sheriff's deputies have received training prior to carrying a taser" and that Perkins and Keith "were already trained and certified on the use of [a taser]" prior to joining the ACSD. (Brockman Dep. 7:22-25, 36:2-5). Thus, it was Brockman's belief that both Perkins and Keith received taser training, and any alleged misunderstanding of this fact cannot be considered an act of deliberate indifference. For this reason, Green's *Monell* claim fails, and

Defendants' motion is granted as to the Section 1983 claims against all Defendants in their official capacities.

### 3.    *State Law Claims*

#### a.    **Official Capacity Claims**

Similar to Green's federal claims, a state law claim against a government official in her/his official capacity is "another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. at 165-66.  Adair County is granted the same sovereign immunity as the Commonwealth of Kentucky.  *See Jones v. Cross*, 260 S.W.3d 343, 345 (Ky. 2008) ("Because the county is a political subdivision of the state, it is "cloaked" with sovereign or governmental immunity." (citation omitted)).  "[A]bsent a waiver thereof, a sheriff, as a county official, has absolute official immunity at common law for torts (by him or his deputies) when sued in his official capacity." *Id.* (citing *Yanero v. Davis*, 65 S.W.3d 510, 517 (Ky. 2001)).  Thus, any state law claim Green has brought against Defendants in their official capacities must be dismissed.  Defendants' motion is granted as to these claims.[6]

#### b.    **Individual Capacity Claims**

#### i.    **Qualified Official Immunity Standard**

Under Kentucky law, public officials and employees have qualified official immunity from tort liability for "(1) discretionary acts or functions [performed] . . . ; (2) in good faith; and (3) within the scope of the employee's authority." *Howell v. Sanders*, 668 F.3d 344, 355 (6th Cir. 2012) (quoting *Yanero*, 65 S.W.3d at 522).  Qualified official immunity protects officials who exercise judgment and discretion from personal liability for damages in order to encourage the full

---

[6] Green "agrees to concede its claim for official misconduct." (Pl.'s Resp. Defs.' Mot. Summ. J. 15 n.1).  Thus, the state law claim for official misconduct is dismissed on this ground as well.

performance of their necessary duties. *New v. Louisville Metro Gov't*, No. 3:15-cv-653-DJH, 2016 WL 1268299, at *4 (W.D. Ky. Mar. 30, 2016) (citing *Haney v. Monsky*, 311 S.W.3d 235, 245 (Ky. 2010)). It has already been determined that Perkins and Keith were performing a discretionary function in their use of force against Green. *See Reich*, 945 F.3d at 982; *see also Marson v. Thomason*, 438 S.W.3d 292, 297 (Ky. 2014) (stating that discretionary acts are those which "call[] for a 'good faith judgment call[] made in a legally uncertain environment.'" (quoting *Yanero*, 65 S.W.3d at 522)).

Because Defendants have demonstrated that that Perkins and Keith were acting within their discretionary authority, Green has the burden "to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523 (citation omitted). Under Kentucky law, the "good faith" component of qualified official immunity has "both an objective and subjective aspect." *Id.* (citing *Harlow*, 457 U.S. at 815). The objective aspect asks whether there was a "violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position." *Id.* This test mirrors the objective reasonableness standard of the qualified immunity analysis above. Taking the facts in the most favorable light to Green, it cannot be determined that Perkins and Keith acted objectively reasonably when they tased Green while he was doused in gasoline and allegedly possessed no lighter. *See Graham*, 490 U.S. at 396 (stating that whether "the suspect poses an immediate threat to the safety of the officers or others" must be considered in determining objective reasonableness). Thus, for the purposes of this motion, the officers' actions do not pass the objective test.

The other component of determining bad faith is the subjective test, which asks whether "the officer or employee willfully or maliciously intended to harm the plaintiff or acted with a

corrupt motive." *Yanero*, 65 S.W.3d at 523 (citation omitted).  Defendants assert that "[t]here is no proof whatsoever in the record that any of the Defendants engaged in any willful, malicious, or intentionally harmful conduct . . ." (Defs.' Mem. Supp. Mot. Summ. J. 26).  Instead, Defendants posit that Perkins and Keith had no "choice available to them except for the use of the taser" to prevent putting themselves at risk as well as to "save [Green's] life and protect his mother from harm." (Defs.' Mem. Supp. Mot. Summ. J. 26).  Green counters this assertion by stating that "Defendants acted with a corrupt motive by supplying false information in the early investigative stages of the criminal action and by giving false testimony to the grand jury." (Pl.'s Resp. Defs.' Mot. Summ. J. 16).  This argument is misguided, as these allegations do not relate to the Defendants' alleged assault/battery, false imprisonment, or negligence.[7]  Regardless, the extent to which Perkins and Keith engaged in willful or malicious conduct towards Green would also turn on whether they tased him while he posed no threat (i.e., whether Green was holding a lighter). For this reason, the subjective test for bad faith also cannot be determined at this time.

Similar to the analysis for qualified immunity pertaining to Green's federal claims, Defendants cannot demonstrate that they are entitled to qualified official immunity for Green's state law claims at this time.  The disputed material fact of whether Green was holding a lighter while he was tased by Perkins and Keith precludes a finding that the officers acted in good faith.

---

[7] The allegation does relate to Green's state law claim for malicious prosecution, but that is irrelevant here as qualified official immunity is not an available defense to malicious prosecution under Kentucky law.  *Martin v. O'Daniel*, 507 S.W.3d 1, 5 (Ky. 2016) (citations omitted) (explaining that "[m]alice is a material fact that a plaintiff must prove to sustain a malicious prosecution claim" and "qualified official immunity is available only to officials acting in good faith.").

This fact requires a jury determination. For this reason, the Green's state law claims below will be analyzed without affording Defendants qualified official immunity.

### ii.    Assault and Battery

Green has brought a claim for assault and battery against Perkins and Keith in their individual capacities. (Am. Compl. ¶¶ 52-57). Under Kentucky law, an assault is "any attempt or offer with force or violence to do a corporal hurt to another, whether from malice or wantonness, with such circumstances as denote at the time an intention to do it coupled with the present ability to carry such intention into effect." *May v. Commonwealth*, 285 S.W.2d 160, 163 (Ky. 1955) (internal quotation marks omitted) (citation omitted). Similarly, battery is "an assault whereby any force, however slight, is actually applied to the person of another, directly or indirectly." *Id.* (internal quotation marks omitted) (citation omitted). In addition to qualified official immunity, Defendants argue they are entitled to a statutory defense under KRS 503.090. That statute provides:

> The use of physical force by a defendant upon another person is justifiable when the defendant, acting under official authority, is making or assisting in making an arrest, and he:
> (a)    Believes that such force is necessary to effect the arrest;
> (b)    Makes known the purpose of the arrest or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested; and
> (c)    Believes the arrest to be lawful.

KRS 503.090(1). Green correctly rebuts that an "officer making an arrest may use such force as may be necessary to make the arrest[,] but no more." *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. 1973) (citations omitted). The state legislature codified this principle in KRS 431.025, which states that "[n]o unnecessary force or violence shall be used in making an arrest." KRS 431.025(3). As stated previously, it cannot be determined at this stage whether Perkins and Keith

used excessive force, because there are still material facts in dispute.  For this reason, Green's claims for assault and battery survive summary judgment.

### iii.  False Imprisonment and Malicious Prosecution

Green has brought a claim for false imprisonment against Perkins and Keith in their individual capacities.  (Am. Compl. ¶¶ 58-61).  Under Kentucky law, "[w]hen a police officer makes an arrest, there is no distinction between the torts of false arrest and false imprisonment; the legal analysis is the same."  *Ming Wen Chen v. Pawul*, No. 2016-CA-001860-MR, 2018 WL 3814764, at *2 (Ky. App. Aug. 10, 2018) (citing *Lexington-Fayette Urb. Cnty. Gov't v. Middleton*, 555 S.W.2d 613, 619 (Ky. App. 1977)).  Green concedes that "false imprisonment . . . can be countered by proving probable cause."  (Pl.'s Resp. Defs.' Mot. Summ. J. 17); *see also Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007) (stating that an officer has the privilege to detain an individual when she/he has probable cause "to believe that a crime was committed and that plaintiff committed it."  (internal quotation marks omitted) (citation omitted)).  Similarly, a state claim for malicious prosecution requires Green to demonstrate a lack of probable cause for his arrest.  *See Reid v. True*, 302 S.W.2d 846, 848 (Ky. 1957) (citation omitted).

As previously analyzed, it cannot be determined whether Defendants had probable cause to arrest Green for wanton endangerment, as that finding requires a jury determination of whether Green was holding a lighter and thus posing a substantial threat to those around him.  Until this disputed fact can be resolved, Green's state law claims for false imprisonment and malicious

prosecution cannot be decided on summary judgment. Defendants' motion is denied as to these claims.

### iv. Negligence, Gross Negligence, and Negligence Per Se

Green has brought claims for negligence, gross negligence, and negligence per se against Perkins and Keith in their individual capacities. (Am. Compl. ¶¶ 66-72). Under Kentucky law, negligence "requires proof that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85 (Ky. 2003) (citation omitted). To demonstrate gross negligence, Green must also show "that [the] negligence was accompanied by wanton or reckless disregard for the lives, safety or property of others." *Louisville SW Hotel, LLC v. Lindsey*, 636 S.W.3d 508, 514 (Ky. 2021) (alteration in original) (internal quotation marks omitted) (quoting *Gibson v. Fuel Transp., Inc.*, 410 S.W.3d 56, 59 (Ky. 2013)). Lastly, "negligence *per se* is merely a negligence claim with a statutory standard of care substituted for the common law standard of care." *Real Est. Mktg., Inc. v. Franz*, 885 S.W.2d 921 (Ky. 1994) (internal quotation marks omitted) (citation omitted), *overruled on other grounds* by *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729 (Ky. 2011). Negligence per se is codified in KRS 446.070, which states that "[a] person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation." *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 535 (Ky. 2011); KRS 446.070.

Beginning with negligence per se, Green appears to be bringing this claim under KRS 522.020—"Official misconduct in the first degree." KRS 522.020. This claim fails for two reasons. First, this negligence per se claim appears to be a reiteration of Green's official

misconduct claim, which he has already conceded.  (Am. Compl. ¶¶ 64-65; Pl.'s Resp. Defs.' Mot. Summ. J. 15 n.1).  Second, Green has failed to address the negligence per se claim in his response to Defendants' motion for summary judgment, so it is presumably abandoned.  *See Bennett*, 86 F.4th at 324 (citations omitted).  For these reasons, Defendants' motion is granted as to the claim for negligence per se.

Regarding negligence and gross negligence, Defendants argue that these claims should be dismissed because (1) Green "does not identify or state how any of the Defendants breached any standard by which their duty is measured" and (2) he cannot prove Defendants' actions were the cause of his injury.  (Defs.' Mem. Supp. Mot. Summ. J. 32-33).  Green fails to respond to Defendants' first argument.  His response makes no reference to a standard of care, nor how Perkins and Keith violated a duty owed to Green.  He, therefore, has abandoned his claims for negligence and gross negligence.  *See Bennett*, 86 F.4th at 324 (citations omitted).  Defendants' motion is granted as to these claims.

### v.    IIED

Lastly, Green has brought a claim for IIED against all Defendants.  (Am. Compl. ¶¶ 73-75).  To state a claim for IIED, Green must plausibly allege that "[1] [t]he wrongdoer's conduct [was] intentional or reckless; [2] the conduct [was] outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; [3] there [was] a causal connection between the wrongdoer's conduct and the emotional distress; and [4] the distress suffered [was] severe." *Osborne v. Payne*, 31 S.W.3d 911, 913-14 (Ky. 2000).  "[IIED] is intended to redress behavior that is truly outrageous, intolerable and which results in bringing one to his knees." *Id.* at 914 (citing *Kroger Co. v. Willgruber*, 920 S.W.2d 61, 65, 67 (Ky. 1996)).  IIED is a "'gap-filler' providing redress for extreme emotional distress in those instances in which the

traditional common law actions [do] not." *Rigazio v. Archdiocese of Louisville*, 853 S.W.2d 295, 299 (Ky. App. 1993). The Kentucky Supreme Court has held that "if a set of facts establishes a traditional tort, by definition it *cannot* establish intentional infliction of emotional distress." *Childers v. Geile*, 367 S.W.3d 576, 584 (Ky. 2012). Thus, "[t]he tort of [IIED] was intended to supplement the existing forms or recovery, not swallow them up." *Id.* at 581 (quoting *Rigazio*, 853 S.W.2d at 299 (internal quotations omitted)).

In the current case, Green has not established how his claim for IIED provides for an alternative remedy not available for his traditional tort claims (i.e., assault/battery). His response provides no explicit allegations regarding the emotional distress he experienced, nor how any recovered damages under IIED would supplement—and not swallow—his claims for assault/battery. For this reason, Defendants' motion for summary judgment is granted for the IIED claim.

### C.      Defendants' Motion to Exclude and Plaintiff's Motion to Strike

Defendants move to exclude "(a) any evidence or testimony of Benjamin Garrison ["Garrison"] or other experts; (b) any expert testimony regarding how a taser, defibrillator or any other type of current could cause a fire; and (c) any evidence or testimony regarding the cause of []Green's physical injuries." (Defs.' Mot. Exclude 1, DN 36). Green has filed a response as well as a separate motion to "[s]trike Defendants' Motion to Exclude (DN 36) and to strike Defendants' Reply to Plaintiff's Response (DN 46) . . . ." (Pl.'s Mot. Strike 1, DN 50). Defendants' proposed exclusions will be addressed, in turn, followed by Green's motion to strike.

First, Defendants seek to bar any testimony from Garrison, who they claim is an expert witness that Green failed to disclose by the January 2, 2024, deadline. (Defs.' Mot. Exclude 5). Green rebuts this contention by asserting that Garrison will not be used an expert witness and will

instead testify as a lay witness "capable of properly establishing the foundation for and authenticating the lab report." (Pl.'s Resp. Defs.' Mot. Exclude 3, DN 41).[8]  Defendants correctly note that Garrison was also not disclosed as a fact witness in Green's Rule 26(a)(1) Initial Disclosures.  (Defs.' Mot. Exclude 4).  Green counters that "[a]t this time, the parties have not been required to disclose all trial witnesses or disclose all evidence that will be used for trial." (Pl.'s Mot. Strike 2).  Thus, Green argues that Garrison may still serve as a fact witness.

This argument is misguided, as parties were required to "have made all initial disclosures required of Fed. R. Civ. P. 26(a)(1)" by March 15, 2023.  (Scheduling Order 1).[9]  Green claims that Harrison was implicitly disclosed as a witness because his "initial disclosure . . . explicitly includes '[a]ll witnesses set forth in Defendants' initial disclosures'" and "[in] Defendants' own Rule 26(a)(1) Initial Disclosures, they list [a]ny person involved with or with knowledge of Adair County Circuit Court Case No. 21-CR-194 . . . ."  (Pl.'s Mot. Strike 2 (internal quotation marks omitted)).  Green argues that "Benjamin Garrison clearly falls within this category, as he was a witness who testified on behalf of the Commonwealth in that very case."  (Pl.'s Mot. Strike 2).

In response, Defendants point out that Rule 26 states a party must provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. P. 26(a)(1)(A)(i).  Green has not provided this information for Garrison.  Furthermore, the Scheduling

---

[8] Garrison previously testified as a fact witness in Green's underlying criminal case, in which "[h]is testimony encompassed the findings of the Kentucky State Police lab report, which [Green contends] clearly states that no gasoline was present on Vickie Smith's clothing."  (Pl.'s Resp. Defs.' Mot. Exclude 3).

[9] The deadline for fact discovery was extended to December 15, 2024, and the deadline for dispositive motions was extended to January 15, 2025.  (Order 1, DN 30).

Order from December 21, 2022, clearly warns parties that "no witness not previously disclosed as one likely to have discoverable information under Fed. R. Civ. P. 26(a)(1)(A)(i), and no exhibit which has not been provided under Fed. R. Civ. P. 26(a)(1)(A)(ii), shall be allowed on the final witness and exhibit list, unless the failure was substantially justified or is harmless." (Scheduling Order 2). Discovery has ended, and it appears Green did not state his intention to use Garrison as a witness until his response to Defendants' motion to exclude on January 31, 2025. (*See* Pl.'s Resp. Defs.' Mot. Exclude 3). All supplementations to the Rule 26 disclosures were required to be made "no later than thirty days prior to the end of discovery." (Scheduling Order 1-2). For these reasons, Defendants' motion to exclude "any evidence or testimony of Benjamin Garrison ["Garrison"] or other experts" is granted.[10]

Next, Defendants seek to exclude "any evidence or testimony regarding the cause of []Green's physical injuries." (Defs.' Mot. Exclude 1). The Court has ruled that Green cannot present any expert testimony at trial, as he has not disclosed any expert witnesses. The Court also recognizes Green's "layperson's exception" for "injuries whose cause can be reasonably inferred from common knowledge." *See Tatham*, 439 S.W.2d at 939. Green argues that "[n]o expert is required where causation is obvious" and "[i]t is widely understood that a spark or flame can ignite gasoline, causing combustion." (Pl.'s Resp. Defs.' Mot. Exclude 2). The Court agrees with Green that "[l]aypersons inherently understand that gasoline and a spark—whether from a lighter or a taser—can start a fire[;]"the dispute is whether Green's injuries were caused by a lighter he supposedly held before the tasers were unquestionably deployed. (Pl.'s Resp. Defs.' Mot. Exclude

---

[10] This includes Defendants' request to exclude "any expert testimony regarding how a taser, defibrillator or any other type of current could cause a fire[,]" as this request appears to be encompassed by their first request to exclude the testimony of any "other experts". (*See* Defs.' Mot. Exclude 1).

3).  For this reason, Defendants' motion to exclude any  causation evidence as to Green's injuries is denied as this time.

Finally, relying on Fed. R. Civ. P. 12(f), Green moves to strike Defendants' motion to exclude and Defendants' reply to their motion to exclude on the grounds that the filings present a "bad faith attempt to suppress Benjamin Garrison's testimony."  (Pl.'s Mot. Strike 1).  Under Rule 12(f), "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  This rule, however, is inapplicable because neither a motion to dismiss nor a reply to a motion dismiss is a pleading.  *See Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 420 (6th Cir. 2000) ("A Rule 12(b)(6) motion to dismiss does not qualify as a 'pleading' . . . ." (citing Fed. R. Civ. P. 7(a)).  Nevertheless, there does not appear to be a valid basis for striking these filings.  Accordingly, this motion is denied.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Defendants' Motions for Leave to File Excess Pages (DN 35, 47) are **GRANTED**.

2.    Defendants' Motion for Summary Judgment (DN 34) is **GRANTED IN PART** and **DENIED IN PART**.  The following claims are dismissed: (1) all claims against Defendants in their official capacities, including Plaintiff's *Monell* claims; (2) all claims against Brockman in his individual capacity; (3) Plaintiff's Section 1983 claim for unreasonable search and seizure; (4) Plaintiff's state law claims for negligence, gross negligence, negligence per se, and IIED.  The following claims remain:  (1) Plaintiff's Section 1983 claims for excessive force, false arrest, and malicious prosecution against Perkins and Keith in their individual capacities; (2) Plaintiff's state law claims for assault/battery, false imprisonment, and malicious prosecution against Perkins and Keith in their individual capacities.

3.      Defendants' Motion to Exclude (DN 36) is **GRANTED IN PART** and **DENIED IN PART.**  Green may not present any expert witnesses or testimony.  Additionally, Plaintiff may not present Garrison as a fact witness.  A jury determination is necessary to determine whether Plaintiff may use the layperson's exception to prove causation as to his injuries.

4.      Plaintiff's Motion to Strike (DN 50) is **DENIED.**

Greg N. Stivers, Chief Judge

United States District Court

July 15, 2025

cc:     counsel of record

31